James JOHNSON, Plaintiff,

v.

Lester WRIGHT, M.D., M.P.H., Assoc. Commissioner; Glenn S. Goord, Commissioner, Docs; Carl J. Koeninigsmann, M.D., Facility Health Director; Albert Paolano, M.D.; William Smith, M.D., Great Meadow Corr. Fac.; George B. Duncan, Supt. Great Meadow Corr. Facility and John E. Cunningham, Jr., M.D., Defendants.

No. 01 Civ. 2122(GWG).

United States District Court, S.D. New York.

Dec. 6, 2002.

James Johnson, Sullivan Correctional Facility, Fallsburg, New York, for Plaintiff, pro se.

John E. Knudsen, Assistant Attorney General, New York, New York, for Defendants.

*OPINION AND ORDER*

GORENSTEIN, United States Magistrate Judge.

Defendants Glenn S. Goord; Albert Paolano, M.D.; William Smith, M.D.; George B. Duncan; Lester Wright; Carl J. Koenigsmann, M.D.; and John E. Cunningham, Jr., M.D. move this Court to dismiss

plaintiff James Johnson's *pro se* amended complaint. The parties have consented to the disposition of this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the defendants' motion is granted in part and denied in part.

## I. FACTS

### A. Background

Johnson filed the original complaint in this matter on March 13, 2001, pursuant to 42 U.S.C. § 1983 alleging that the defendants deprived him of his civil rights under the Eighth and Fourteenth Amendments to the Constitution due to their failure to provide him with medical treatment. After the defendants moved to dismiss that complaint, Johnson sought and obtained permission to file an Amended Complaint ("Am.Compl."). Defendants have now moved to dismiss the Amended Complaint.

For purposes of this motion only, the Court accepts the facts alleged in the complaint to be true. In light of Johnson's *pro se* status, the Court will also deem the factual allegations contained in Johnson's briefs to supplement his amended complaint. *See, e.g., Woods v. Goord,* 2002 WL 731691, at *1 n. 2 (S.D.N.Y. Apr.23, 2002) (considering *pro se* prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan.26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.'") (quoting *Gadson v. Goord,* 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov.17, 1997)) (citations omitted). Examining such materials is consistent with the principle that a court may not dismiss a *pro se* complaint unless it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *accord Lerman v. Bd. of Elections,* 232 F.3d 135, 140 (2d Cir.2000), *cert. denied,* 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001).

### B. Johnson's Allegations

From February 28, 1997 until November 9, 1999, Johnson was incarcerated at Green Haven Correctional Facility ("Green Haven"). Am. Compl. ¶ 1. On April 24, 1997, Johnson went to Green Haven's medical clinic complaining of "several illness[es]." *Id.* ¶ 2. He was seen by medical personnel at Green Haven and was transported later that day from Green Haven to St. Agnes Hospital ("St.Agnes") in White Plains, New York. *Id.* At the time of his admission to St. Agnes, he had a glucose reading of "well over 500." *Id.*

Johnson was diagnosed with "Grade III, Stage III, with bridging fibrosis, approaching Cirrhosis positive for Chronic Hepatitis 'C' virus." *Id.* ¶ 3. Johnson was discharged from St. Agnes on May 10, 1997, and transferred back to Green Haven. *Id.* ¶ 4. He was instructed to report to the "G.I. Clinic" in three months from the date of his discharge. *Id.* Johnson continued to be seen at Green Haven by Dr. Antonelle, a doctor from the G.I. Clinic, every three months. *Id.* ¶ 5. In February 1998, Johnson began treatment for Hepatitis C with the drug Interferon. *Id.* ¶ 6. He received intravenous injections of Interferon three times a week. *Id.*

On May 26, 1998, Johnson was given a urinalysis test. *Id.* ¶ 7. The next day, Johnson received his results from that

test, which indicated he had tested positive for "cannabinoid," commonly known as marijuana. *Id.* Disciplinary actions were taken against him as a result of the positive test result. *Id.*

On June 3, 1998, the Food and Drug Administration ("FDA") approved a combination of two drugs for treatment of Hepatitis C. *Id.* ¶ 8. This new treatment was called "Rebetron Therapy Combination" ("Rebetron Therapy") and consisted of Interferon used in conjunction with Ribivarin. *Id.* Rebetron Therapy is the only medical treatment that has been prescribed by the FDA for Hepatitis C patients who have relapsed during their treatment with Interferon alone. Plaintiff's Response to Defendant's [sic] Reply, dated July 2, 2002 ("Pl.Sur–Reply"), at 1.

Sometime after this, Johnson "relapsed" while on Interferon alone. *See* Response in Opposition, dated June 4, 2002 ("Pl. Opp."), at 2. Accordingly, on February 4, 1999, Johnson's health care provider at Green Haven, Tom Scales, M.D., requested that Johnson be treated with Ribivarin "as soon as approval can be obtained." Am. Compl. ¶ 9. On May 19, 1999, Dr. Antonelle, to whom Johnson had been referred, also stated that Johnson should be on Ribivarin. *Id.* ¶ 10. Dr. Scales consulted with Dr. Koeningsmann on May 24, 1999, and requested that the GI clinic give Johnson Ribivarin. *Id.* ¶ 11. However, Johnson was "refused [Ribivarin] treatment because of a bad urine test for marijuana," a refusal that was mandated by a Department of Correctional Services ("DOCS") policy. *Id.* ¶ 12. On August 27, 1999, Johnson was seen by Dr. Antonelle, who wrote that he felt that the DOCS policy should not preclude the prescription of Ribivarin for Johnson and requested that Johnson be approved for Rebetron therapy. *Id.* In the interim, Dr. Antonelle increased the dosage of Interferon taken

by Johnson. *Id.* Dr. Koenigsmann was the prison official who denied the requests of Johnson's doctors that he be treated with Rebetron Therapy. *Id.* ¶ 23.

On August 30, 1999, Johnson contacted defendant Lester Wright, M.D. about the DOCS policy regarding the denial of Rebetron Therapy to those who had tested positive for marijuana. *Id.* ¶ 13. Dr. Wright failed to answer Johnson's correspondence. *Id.*

On November 9, 1999, Johnson was transferred to Great Meadow Correctional Facility ("Great Meadow"). *Id.* ¶ 14. On June 15, 2000, Johnson filed a grievance against the defendants' policy (allegedly authored by Dr. Wright, *see id.* ¶¶ 13, 15) of denying Hepatitis C treatment to prisoners who had tested positive for drugs and requested that he be allowed to receive Rebetron Therapy. *Id.* ¶ 15. On June 16, 2000, Johnson wrote to Dr. Wright and Commissioner Goord concerning the denial of his treatment with Rebetron Therapy. *Id.* ¶ 16. Dr. Wright instructed Dr. Cunningham to respond to Johnson's letter, which he did on July 25, 2000. *Id.*

Johnson was interviewed by an administrative nurse at Great Meadow on July 7, 2000, regarding his grievance. *Id.* ¶ 17. He was told that he had to complete successfully a substance abuse program to be considered for Rebetron Therapy. *Id.* Johnson informed her that he had already completed such a program while at Green Haven. *Id.* Subsequently, Johnson presented his certificate from that substance abuse program to the administrative nurse. *Id.* Johnson had received this certificate prior to the denial of Rebetron Therapy. Pl. Opp. at 16. The nurse also ordered a blood test, which took place on July 20, 2000. Am. Compl. ¶ 17

On July 26, 2000, Johnson received a letter from Dr. Cunningham, in response

to Johnson's letter to Dr. Wright. *Id.* ¶ 18. This letter informed Johnson that he was infected with Hepatitis B as well as Hepatitis C, that Dr. Cunningham had discussed Johnson's medical condition with Dr. Paolano and that Dr. Paolano had determined that Rebetron Therapy was "a relative contraindication to the treatment of Hepatitis 'C' [sic]." *Id.*[1]

Dr. Cunningham also recommended that Johnson direct his medical concerns to the medical staff at Great Meadow. *Id.* The letter indicated that copies had been sent to Dr. Wright, Dr. Paolano and Duncan. *Id.* On July 27, 2000, the result from Johnson's July 20, 2000, blood test came back negative for Hepatitis B. *Id.* ¶ 19.

On August 7, 2000, the administrative nurse, in conjunction with Dr. Smith, asked Dr. Wright to permit Johnson to be given Rebetron Therapy. *Id.* ¶ 20. On July 28, 2000, Johnson received a letter from Dr. Wright in response to a letter sent by Johnson to Commissioner Goord on June 16, 2000. *Id.* ¶ 21. The letter informed Johnson that his request for Rebetron therapy had been approved. *Id.* On August 7, 2000, Johnson received his first treatment with Rebetron Therapy. *Id.* ¶ 22.

## II. *DISCUSSION*

Johnson's amended complaint seeks both monetary damages and injunctive relief on the ground that the defendants'

failure to provide him with Rebetron Therapy violated his rights under the Eighth and Fourteenth Amendments.[2] *See* Am. Compl. ¶¶ 34–56. The facts alleged in the Amended Complaint, however, only bear on violations under the Eighth Amendment, which prohibits by virtue of the Cruel and Unusual Punishments Clause the "deliberate indifference to [a prisoner's] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The only relevance of the Fourteenth Amendment is that its Due Process Clause makes the Eighth Amendment's bar on cruel and unusual punishments applicable to the states. *Id.* at 101, 97 S.Ct. 285. Accordingly, the Court will treat plaintiff's Amended Complaint as raising solely a claim under the Eighth Amendment.

### A. *Legal Standard for Motion to Dismiss*

■ In deciding a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the Court must accept all of Johnson's factual allegations as true. *See Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001) (on motion to dismiss, court is required to "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of the plaintiff.") (citation omitted). "At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is

---

**1.** Johnson presumably means to allege Hepatitis "B."

**2.** Johnson also makes reference to N.Y. Corr. L. § 137(1). Am. Compl. ¶¶ 35, 37. This law, however, merely requires the Commissioner to establish a classification program for all Department of Correctional Services' facilities. There is no allegation that this program was not put into effect.

Johnson separately claims that the defendants' actions violated a judgment in another

civil case, *Milburn v. Coughlin,* No. 79 Civ. 5077(RJW). Am. Compl. ¶ 39. Any action seeking to enforce that judgment, however, may not be brought as part of this case. *See, e.g., Bryant v. Coughlin,* 1999 WL 232705, at \*2 (S.D.N.Y. Apr.21, 1999); *Candelaria v. Coughlin,* 1994 WL 707004, at \*7–\*9 (S.D.N.Y. Dec.19, 1994); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y. 1990), *appeal dismissed,* 929 F.2d 922 (2d Cir.1991).

likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quoting *Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir.1996)). Where the plaintiff appears *pro se,* the complaint "[is] held 'to less stringent standards than formal pleadings drafted by lawyers....'" *Hughes,* 449 U.S. at 9, 101 S.Ct. 173 (quoting *Haines,* 404 U.S. at 520, 92 S.Ct. 594). "Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman,* 232 F.3d at 139–40 (2d Cir.2000) (emphasis in original) (citations omitted); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted " 'to raise the strongest arguments that they suggest.' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). A *pro se* complaint should not be dismissed by a court pursuant to Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes,* 449 U.S. at 10, 101 S.Ct. 173 (citation omitted). Courts must also be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (citations omitted).

**B.** *Plaintiff's Claim of Deliberate Indifference*

■ To succeed in an action brought pursuant to section 1983, a plaintiff must show that there has been a denial of a constitutional or federal statutory right and that the deprivation of such right oc-

curred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 does not grant any substantive rights but rather "provides a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

■ In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious medical needs." *Estelle,* 429 U.S. at 104, 97 S.Ct. 285. The deliberate indifference standard consists of both an objective prong and a subjective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) *("Hathaway I"), cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

1. *Serious Medical Need*

■ Under the objective prong, a prisoner must demonstrate that the alleged medical need is "sufficiently serious." *Id.* (citations omitted). A serious medical need arises where " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Chance,* 143 F.3d at 702 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks and citations omitted); *see also Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (serious medical need is " 'a condition of urgency, one that may produce death, degeneration or extreme pain.' ") (quoting *Hathaway I,* 37 F.3d at 66). Defendants assert that because Johnson was being treated in some fashion for his Hepatitis

C, the difference between his treatment by Interferon as opposed to Rebetron Therapy does not qualify his condition as "serious" for deliberate indifference purposes and that Johnson also has not pleaded with the requisite specificity that his condition "degenerated" during his treatment with Interferon alone. Memorandum of Law in Support of Defendant's [sic] Motion to Dismiss, dated April 15, 2002 ("Def.Mem."), at 8.

The Court rejects this argument. As the Supreme Court has recently reiterated, the Federal Rules of Civil Procedure require that a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley*, 355 U.S. at 47, 78 S.Ct. 99); *see* Fed.R.Civ.P. 8(a). Here, Johnson alleges (1) that his treatment with Interferon was not adequate to treat his condition, thus amounting to "no treatment at all," Pl. Sur–Reply at 2, and (2) that the failure to treat him with Rebetron Therapy caused him to maintain his state of "relapse." Pl. Opp. at 2.

■ Although federal courts are reluctant to "second guess medical judgments and constitutionalize [medical malpractice claims]" where the prisoner has actually received medical treatment, deliberate indifference will be found where "the medical attention rendered [was] so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976) (citation omitted). The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the "course of treatment was largely ineffective and [the defendant] declined to do anything more to attempt to improve [the plaintiff's] situation." *Hathaway I*, 37 F.3d at 68; *see also Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir.1970) (per curiam) ("Prison officials and medical officers have wide discretion in treating prisoners," but may be liable where the treatment provided was "so cursory as to amount to no treatment at all.").

■ ■ Johnson's allegation that he relapsed during the Interferon treatment due to the lack of Rebetron Therapy is also sufficient to show deliberate indifference to his serious medical needs. Johnson alleges that hepatitis, if not treated properly, would lead him to "suffer severe internal organ damage, e.g. chronic liver disease, cirrhosis, liver cancer and inevitably death." Pl. Op. at 16. Case law also recognizes that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis. *See McKenna v. Wright*, 2002 WL 338375, at *8 (S.D.N.Y. Mar.4, 2002) (citing cases); *Carbonell v. Goord*, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). Johnson's allegations are sufficient to demonstrate that he had a "serious medical need" that was not being addressed by Interferon alone.

### 2. *Defendants' Culpable State of Mind*

■ Under the subjective component of the deliberate indifference standard, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1995) ("*Hathaway II*"). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway II*, 99 F.3d at 553 (quoting *Farmer v. Brennan*,

511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

■■■■ While the medical care received by the prisoner must be adequate, a prisoner is not entitled to receive treatment by every medical alternative. *See generally Estelle*. 429 U.S. at 106–07, 97 S.Ct. 285. A difference of opinion between a prisoner and his doctors regarding medical treatment does not rise to the level of a constitutional violation. *See Chance*, 143 F.3d at 703; *see also Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications, diagnostic techniques . . . forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") (citation omitted). Generally, "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment . . . [a court] will not second guess the doctors." *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir.1987) (citations omitted).

■■■■ Nonetheless, "[p]rison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors." *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir.1987) (citation omitted). Prison officials may not "substitute their judgments for a medical professional's prescription." *Zentmyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir.2000). "If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference." *Id.* Indeed, in some instances even prison doctors may be held liable for a failure to provide medical care recommended by other doctors. *See Woods*, 2002 WL 731691, at *4–*5 (although plaintiff obtained regular medical care, claim for deliberate indifference stated where plaintiff alleged that prison doctors had delayed in complying with and/or had ignored the directives of specialists over several years).

■■■■ Defendants have characterized Johnson's allegations of deliberate indifference as demonstrating nothing more than a disagreement between Johnson and prison officials over the appropriate treatment method for his Hepatitis C infection. *See generally* Def. Mem. at 5–8. The defendants assert that Johnson "received proper, if not the most advanced, medical treatment" for his condition because he received Interferon for his Hepatitis C infection. Def. Mem. at 5. Defendants also argue that Johnson "was seeking to receive a then brand new therapy approved by the FDA" and that "while [Johnson] may want the newest treatment as soon as it is approved by the FDA, the Constitution does not require that the defendants provide such exceptional care." Def. Mem. at 6. In further support of their argument that Johnson received adequate medical care, defendants state that Johnson, by his own admission, "was diagnosed with [Hepatitis C], was seen by medical staff, was regularly sent to an outside clinic to treat his illness, and was given the only drug available [prior to the approval of Ribivarin] to treat his illness." Def. Mem. at 6. Since Johnson was administered Interferon for his condition, the defendants reason that the directives of

Johnson's doctors that he should begin receiving Rebetron Therapy constituted "a mere disagreement over the proper treatment" which is not actionable as a constitutional violation; they argue that the disagreement alleged is one "between physicians." Reply Memorandum in Support of Defendants' Motion to Dismiss, dated June 21, 2002 ("Reply Mem."), at 3.

The defendants' reading of the complaint—in particular, that it alleges a disagreement "between physicians"—is inconsistent with the thrust of plaintiff's claim in this matter. Defendants are correct that if Johnson's claim was one concerning a mere disagreement between physicians, such allegations would likely not state a claim of deliberate indifference. *See, e.g., Sonds,* 151 F.Supp.2d at 312. Johnson's complaint, however, makes clear that there was no disagreement between his treating physicians over his proper treatment. Johnson instead alleges that *all* of his treating physicians, both inside the prison (Dr. Scales and Dr. Smith) and outside (Dr. Antonelle), agreed that the necessary treatment for his condition was the Rebetron Therapy treatment. Am. Compl. ¶¶ 9, 10, 11, 12, 20. The only disagreement was between all of the physicians on one hand and the prison administration on the other—one of whose members was a doctor who never examined, let alone treated, the defendant. Removing any doubt as to whether Johnson's claim reflects a difference of opinion over medical judgments, Johnson further alleges that the basis for the prison administration's decision was completely unrelated to any medical judgment. He alleges instead that the decision was based solely on a prison policy barring treatment where there has been a positive test for illegal drugs, *id.* ¶ 12, and that the policy served as a "punish[ment]" for illegal drug use. Pl. Opp. at 7. In other words, this case does not involve a disagreement among physicians exercising their medical judgments as to the appropriate course of treatment of a prisoner.

In support of their argument for dismissal, the defendants cite to cases involving prisoners who insisted upon a treatment that had not been prescribed by any doctor or who disagreed with their doctors' proposed treatments. *See, e.g., Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir.1999); *McKenna,* 2002 WL 338375, at *8; *Carbonell,* 2000 WL 760751, at *9. Here, however, Johnson alleges that he was prescribed the appropriate treatment for a "relapsed" Hepatitis C patient by all of his treating physicians—namely, Rebetron Therapy—but was denied this prescribed treatment by prison officials for 15 months. He also alleges that he was denied this treatment not for any medical reason but because he had tested positive for "cannabinoid" drugs. *See* Am. Compl. ¶¶ 8–20, 26; Pl. Opp. at 6–7. Although defendants assert there was a medical reason for the denial of Rebetron Therapy, that reason may not be considered on this motion to dismiss. The issue before this Court "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance,* 143 F.3d at 701 (internal quotation marks and citations omitted). The amended complaint thus states a claim under the Eighth Amendment.

## III. *PERSONAL INVOLVEMENT AND SECTION 1983*

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of respondeat superior. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a pre-

requisite to an award of damages under § 1983' and that a complaint must allege such personal involvement." *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y. 2001) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (in turn quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991))). The Second Circuit has held that a defendant state official has the requisite personal involvement for section 1983 liability where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

The Second Circuit has also held that an allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to section 1983 liability. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (a mere "linkage in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of section 1983). Thus, it appears that the second example listed in *Colon*—permitting supervisory liability where a "defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,"—should not be too broadly construed. First, to allow a mere letter to an official to impose supervisory liability would permit an inmate to place liability on individuals who had no authority over the situation complained of merely by sending letters. Second, the origin of this second example, *United States ex rel. Larkins v. Oswald* 510 F.2d 583, 589 (2d Cir.1975), involved a supervisory official who was mandated by regulation to receive reports of certain prison conditions.

As a result, a number of courts have held that "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Greenwaldt v. Coughlin,* 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) (citations omitted); *accord Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (allegations that inmate wrote to prison officials and was ignored insufficient to hold those officials liable under section 1983); *Woods v. Goord,* 1998 WL 740782, at *6 (S.D.N.Y. Oct.23, 1998) ("Receiving letters or complaints ... does not render [prison officials] personally liable under § 1983."); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (citations omitted). As one court noted, "if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability." *Walker v. Pataro,* 2002 WL 664040, at *12 (S.D.N.Y. Apr.23, 2002) (emphasis in original). Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint. *See, e.g., Ramos v. Artuz,* 2001 WL 840131, at *8–*10 (S.D.N.Y. July 25, 2001) (person-

al liability where prison official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff"); *cf. Johnson v. Bendheim*, 2001 WL 799569, at *6 (S.D.N.Y. July 13, 2001) (motion to dismiss denied as to prison official who received prisoners' grievances and denied them); *James v. Artuz*, 1994 WL 174005, at *7 (S.D.N.Y. May 4, 1994) (denying summary judgment where a prison official conducted a *de novo* review of a prison disciplinary hearing); *Van Pelt v. Finn*, 1993 WL 465297, at *6 (S.D.N.Y. Nov.12, 1993) (prison official demonstrated personal involvement when he reviewed plaintiff's grievances).

With these principles in mind, each defendant is discussed in turn.

■ *Goord.* Goord is the Commissioner of the Department of Correctional Services. Johnson has alleged that he wrote a letter to Goord on June 16, 2000 concerning the denial of Rebetron Therapy to Johnson. Other defendants responded to that letter. Am. Compl. ¶¶ 16, 21. As noted, a letter of this kind cannot create personal liability.

Johnson also states vaguely that Goord "was acutely aware of plaintiff's medical situation due to correspondence/communications received from plaintiff, and other levels of his administration." Am. Compl. ¶ 30. Mere awareness of a constitutional violation, however, is insufficient to impose liability.

■ Johnson does allege, however, that Goord was "grossly negligent in supervising [his] subordinates." Am. Compl. ¶ 30. It is also apparent that Johnson is alleging that this failure to supervise resulted in Johnson's failure to get the Rebetron Therapy. Allegations of this kind are sufficient to establish liability. *See Colon*, 58 F.3d at 873; *accord Poe v. Leonard*, 282

F.3d 123, 140 (2d Cir.2002). While defendants contend that this allegation is conclusory, it is sufficient to give Goord notice of the particular claim being made and thus must be accepted by the Court for purposes of a motion to dismiss. *See Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992. Accordingly, Goord may not be dismissed as a defendant.

■ *Duncan.* Johnson alleges that Duncan is the Superintendent of the facility in which he was housed; "was acutely aware of plaintiff's medical situation due to correspondence/communications received from plaintiff," Am. Compl. ¶ 29; and "intentionally ignored plaintiff's correspondence/communications." Pl. Opp. at 9. There is no allegation that Duncan replied to this correspondence or took any other action in regard to the correspondence. Again, an allegation that a prison official received correspondence and did not act on it does not state a claim for personal involvement under section 1983.

Nonetheless, Johnson does allege that Duncan was "grossly negligent in supervising [his] subordinates." *Id.* Duncan was allegedly responsible for the supervision of the individuals who declined to prescribe the Rebetron Therapy. Thus, the allegation does state a claim under *Colon* and Duncan must remain as a defendant.

■ *Dr. Paolano.* Johnson alleges that Dr. Paolano had discussions regarding Johnson's condition with Dr. Cunningham, Am. Compl. ¶ 18, and related "some misinformation" to defendant Cunningham concerning Johnson's infection with Hepatitis B. *Id.* ¶ 24. There are no allegations that Dr. Paolano acted on any of the correspondence he received. Accordingly, Johnson has failed to plead any personal involvement on the part of Dr. Paolano.

■ *Dr. Cunningham.* Dr. Cunningham is alleged to be the regional medical

director of several prison facilities. Am. Compl. § III(C); Pl. Opp. at 12. Johnson claims that Dr. Cunningham (allegedly on behalf of Dr. Wright) wrote a letter received by Johnson on July 26, 2000, informing Johnson that he was infected with Hepatitis B as well as Hepatitis C and that Rebetron Therapy was contraindicated for individuals infected with Hepatitis B. Am. Compl. ¶ 18. The denial contained in Dr. Cunningham's letter was premised on the medical judgments of Dr. Cunningham (allegedly in consultation with Dr. Paolano), that Johnson was also infected with Hepatitis B and thus treatment with Rebetron Therapy was not advisable. *Id.* The July 26, 2000, denial stands in contrast with the original denial of Rebetron Therapy to Johnson, which was premised on the fact that Johnson had tested positive for "cannabinoid" drugs, *id.* ¶ 12, and which was allegedly punitive in nature. *See* Pl. Opp. at 7. Although Johnson learned on July 27, 2000 that in fact he was not infected with Hepatitis B, Am. Compl. ¶ 19, and was informed the next day (through correspondence from Dr. Wright) that he had been approved for Rebetron Therapy, *id.* ¶ 21, this allegation demonstrates that Dr. Cunningham had merely made an error in his diagnosis and treatment recommendations. Such an error would constitute at best only negligence and thus is not actionable as a constitutional violation. *See Estelle*, 429 U.S. at 106, 97 S.Ct. 285 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") Moreover, as Johnson was approved for Rebetron Therapy the day after receiving Dr. Cunningham's letter, Am. Compl. ¶¶ 18, 21, the letter plainly played no role in the denial or delay of Johnson's treatment with Ribivarin. Thus, Dr. Cunningham must be dismissed as a defendant.

■ *Dr. Smith.* Johnson alleges that Dr. Smith was his primary health care provider at Great Meadow. Pl. Opp. at 9; *see* Am. Compl. § III(C). Johnson claims that Dr. Smith requested that Johnson be treated with Rebetron Therapy, Am. Compl. ¶ 20, an allegation that certainly cannot qualify as personal involvement in the denial of Johnson's Rebetron Therapy. The only allegation Johnson has made concerning Dr. Smith's personal involvement in Johnson's alleged mistreatment is that Dr. Smith has not seen him since the Rebetron Therapy began in August 2000. *Id.* ¶ 25. Johnson does not allege, however, that he has presented any medical complaints that have been ignored or that Dr. Smith's failure to visit him has caused him any serious harm or interfered with his treatment. He also does not allege that Dr. Smith was involved at any time with the denial of Rebetron Therapy to Johnson. Accordingly, Johnson has failed to plead the requisite personal involvement of Dr. Smith for purposes of section 1983 liability.

In sum, the Amended Complaint must be dismissed as to Dr. Cunningham, Dr. Paolano and Dr. Smith. Defendants have not attempted to argue that Dr. Koenigsmann and Dr. Wright were not personally involved in the alleged violation. Accordingly, they remain as defendants in this matter along with Goord and Duncan.

## IV. *QUALIFIED IMMUNITY*

■ Qualified immunity is a defense to section 1983 liability. *See, e.g., Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). It is well established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted); *accord Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993) ("Public officials are entitled to qualified immunity" from suit where "their conduct does not violate a clearly established statutory or constitutional right.") (citation omitted). A public official is immune from suit if it was not clear to the official at the time of the acts complained of that "the interest asserted by the plaintiff was protected by a federal statute or by the Constitution." *Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citation omitted).

In determining whether the defendants are entitled to qualified immunity, the court must initially decide whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the official's conduct was violative of the plaintiff's constitutional rights, as has been alleged here, the court must then determine whether the right in question was clearly established at the time the violation occurred. *See id.* at 202, 121 S.Ct. 2151 (it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted") (citation omitted). The Second Circuit has held that defendants are entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe,* 282 F.3d at 132–33 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir. 1998)); *accord Loria v. Gorman,* 306 F.3d 1271, 1281–82 (2d Cir.2002). "The availability of the defense depends on whether 'a reasonable [public official] could have believed' his action 'to be lawful, in light of clearly established law and the information [he] possessed.'" *Weyant v. Okst,* 101

F.3d 845, 858 (2d Cir.1996) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)) (internal quotation marks and citation omitted).

1. *Violation of Clearly Established Law*

■ The Supreme Court recently addressed the issue of what constitutes "clearly established law" for purposes of the qualified immunity defense. *See Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In *Hope,* the Court rejected a circuit court's ruling that to meet the "clearly established law" test, the facts of previous cases must be "materially similar" to the claims brought by the plaintiff in order to establish that the defendants had violated " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 2515 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). The Court, quoting its previous decision in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), noted that

[i]n some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful[.]"

*Hope,* 536 U.S. at ——, 122 S.Ct. at 2516 (quoting *Lanier,* 520 U.S. at 270–71, 117 S.Ct. 1219) (citation omitted). The Court held that

officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier,* the salient question [a court] ought to [ ] ask[ ] is whether the state of law [at the time of the alleged violation] gave [defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.

*Hope,* 536 U.S. at ——, 122 S.Ct. at 2516.

■■■■ A court analyzing a qualified immunity claim must look to what "the state of the law" was at the time of the violation in order to determine whether the law in question was clearly established. *See id.* At the time of the alleged violations in 1999–2000, the law regarding claims of inadequate medical treatment under the Eighth Amendment put defendants on notice that the Eighth Amendment is violated where a prisoner is deliberately not given medically necessary and available treatment. *See, e.g., Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *Estelle,* 429 U.S. at 106, 97 S.Ct. 285; *Hathaway I,* 37 F.3d at 67–68. This principle clearly covered the claim in the instant case: that it was improper for a prison official to refuse to provide an available treatment—with no medical justification underlying the decision—where that treatment had been recommended unanimously by prison and outside treating doctors and was deemed necessary by them for the prisoner to combat a serious illness such as Hepatitis C. *Gill* even more specifically alerted the defendants to the applicability of Eighth

Amendment law in this case when it held that prison officials violate the Eighth Amendment "if they deliberately defy the express instructions of a prisoner's doctors." 824 F.2d at 196. All these cases, among others setting forth the deliberate indifference standard, gave "fair and clear warning," *Hope,* 536 U.S. at ——, 122 S.Ct. at 2516 (quoting *Lanier,* 520 U.S. at 271, 117 S.Ct. 1219), to defendants that the actions alleged here were unconstitutional.

### 2. *Objective Reasonableness of Officers' Actions*

■■■■ It is not sufficient for the qualified immunity analysis to determine that the right violated was clearly established at the time of its violation. An additional inquiry must be made: whether it was "objectively reasonable for the defendant to believe that his action did not violate such law." *Poe,* 282 F.3d at 133 (quoting *Tierney,* 133 F.3d at 196). "If the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to [immunity]." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151; *accord Loria,* 306 F.3d at 1281–82. One way to demonstrate that a mistake was reasonable would be to show that "reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances." *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995); *accord Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001) (defendant entitled to qualified immunity where "officers of reasonable competence could disagree on the legality of the defendant's actions.") (internal quotation marks and citation omitted).

For purposes of making this determination, the Court is obliged to consider whether the defendants have shown that plaintiff can prove "no set of facts," *Conley,* 355 U.S. at 45, 78 S.Ct. 99, that would overcome the immunity bar. Here, plaintiff has alleged that he was denied vital

medical treatment for a serious illness solely as punishment because he tested positive for marijuana and not for any medical reason. Accepting this allegation as true, the Court concludes that officers of reasonable competence would agree that this was not a valid basis for denying medical treatment.

The defendants have asserted that there was a valid medical justification for the treatment decision—that "drug" use (apparently including marijuana) is incompatible with treatment for Hepatitis C. *See* Def. Mem. at 14 (citing Gary L. Davis & James R. Rodrigue, *Treatment of chronic hepatitis C in active drug users*, New England Journal of Medicine, Vol. 345, No. 3 (July 19, 2001)). Defendants' argument, however, relies on medical evidence outside the complaint (and, indeed, outside the record), and thus cannot be considered on a motion to dismiss. They do not even offer a legal argument as to why the Court could consider this evidence.

In support of their argument for qualified immunity, defendants also point out that "it is objectively reasonable for high level prison officials that [sic] are not medical doctors to refrain from interfering in the medical treatment of inmates." Reply Mem. at 6 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 110–11 (2d Cir.2000)). The plaintiff of course is not arguing that prison administrators improperly refrained from intervening in his treatment. He is alleging just the opposite: that they interfered with his medical treatment for reasons unrelated to any medical need. Obviously, *Cuoco* provides no support for the defendants' position.

For these reasons, the defendants' motion to dismiss on grounds of qualified immunity must be denied.

### Conclusion

For the foregoing reasons, the defendants' motion to dismiss is granted as to defendants Cunningham, Paolano and Smith. The motion to dismiss is denied as to defendants Goord, Duncan, Wright and Koenigsmann.

SO ORDERED.