Dee FARMER, Appellee,

v.

Kenneth MORITSUGU, Appellant.

No. 98–5087.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1998.

Decided Dec. 18, 1998.

Stacy M. Ludwig, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Laura K. McNally argued the cause for appellee. With her on the brief was James J. Sandman.

Before: EDWARDS, Chief Judge, WILLIAMS and RANDOLPH, Circuit Judges.

PER CURIAM:

This case presents the question whether the Medical Director of the Bureau of Prisons ("BOP") can be held personally liable under the Eighth Amendment for the alleged failure to treat a transsexual inmate. Appellee Dee Deidre Farmer ("Farmer"), a trans-

sexual who has been incarcerated in various BOP facilities since 1986, alleges that appellant Kenneth Moritsugu ("Moritsugu"), the BOP's Medical Director, exhibited deliberate indifference to her serious medical needs by failing to ensure that she received treatment for her condition. Moritsugu asserts qualified immunity, arguing that he adhered at all times to the BOP's concededly constitutional medical policy, which invests him with only a very limited role in decisions concerning the diagnosis and care of individual patients in local BOP institutions. We agree that Moritsugu was not the person to whom Farmer's treatment requests were appropriately addressed. We also find that Farmer failed to demonstrate a specific need for treatment, and, therefore, that Moritsugu's response to Farmer's demands could not have constituted deliberate indifference to her medical needs. Accordingly, we reverse the District Court's denial of qualified immunity.

## I. BACKGROUND

### A. *Farmer's Efforts to Obtain Treatment*

Transsexualism is a gender identity disorder, the sufferers of which believe that they are "cruelly imprisoned within a body incompatible with their real gender identity." THE MERCK MANUAL OF MEDICAL INFORMATION 418 (1997). The disorder is commonly accompanied by a desire to change one's anatomic sexual features to conform physically with one's perception of self. To relieve this gender discomfort, transsexuals may pursue some combination of hormone therapy, surgery, and psychological counseling. They may also choose to live in their preferred gender role by dressing, naming, and conducting themselves in conformity with that gender. *See id.* at 418–19.

Farmer is a pre-operative male-to-female transsexual, *i.e.,* she identifies herself as a woman although she is biologically male. For several years prior to her incarceration, Farmer lived as a woman in her dress and conduct. She also received hormone therapy and silicone breast injections. Farmer has never undergone sex re-assignment surgery. However, before her imprisonment, she had an unsuccessful "black market" operation to remove her testicles, and, while in prison, she attempted to perform self-castration.

Since at least 1991, Farmer has actively sought treatment for her transsexualism. She has lodged administrative complaints within the institutions in which she has been incarcerated. She has also initiated multiple lawsuits claiming violations of her constitutional rights arising from her conditions of imprisonment and lack of medical treatment. And, most relevant to the instant case, she has written numerous letters to BOP officials, including Moritsugu, to inform them that she desired, but was not receiving, treatment for her transsexualism. *See* Letters from Farmer to Prison Officials, *reprinted in* Joint Appendix ("J.A.") 66–80. In these letters, Farmer has claimed that, because her condition has worsened during the course of her confinement, she is entitled to some form of treatment. Farmer claims that her pleas for assistance largely have gone unanswered; on this score, she points out that she has received only intermittent counseling from the BOP during her incarceration.

The BOP's general health care mission is to provide essential medical care, defined as care that is either medically mandatory or presently medically necessary in the clinical judgment of health care professionals. *See* FEDERAL BUREAU OF PRISONS, U.S. DEP'T OF JUSTICE, PROGRAM STATEMENT, No. 6000.04 (Dec. 15, 1994) ("HEALTH SERVICES MANUAL"), Ch. 1, § 1, *reprinted in* J.A. 61. The term "medically mandatory" applies to "cases in which urgent intervention is required." *Id.* The term "presently medically necessary" describes treatment "without which an inmate could not be maintained without significant risk of either further serious deterioration of his/her condition or significant reduction of the chance of possible repair after release, or without significant pain or discomfort." *Id.* In addition to this broad mission statement, the BOP's medical policy includes a provision specifically applicable to the treatment of transsexualism, which declares:

It is the policy of the [BOP] to maintain a transsexual inmate at the level of change existing upon admission. Should the Clinical Director determine that either progressive or regressive treatment changes are indicated, the Medical Director must approve these prior to implementation. The use of hormones to maintain secondary

sexual characteristics may be continued at approximately the same levels as prior to incarceration (with appropriate documentation from community physicians/hospitals) and with the Medical Director's approval. HEALTH SERVICES MANUAL, Ch. 5, § 14, *reprinted in* J.A. 64.

The present case centers on the course of predominantly unanswered correspondence by which Farmer sought Moritsugu's intervention in her treatment program. Moritsugu, for his part, acknowledges receiving one letter from Farmer. In that letter, dated July 30, 1992, Farmer apparently requested some combination of treatment—hormones, castration, and/or psychotherapy—for her transsexualism. That letter, in turn, prompted Moritsugu's response of August 11, 1992. *See* Letter from Moritsugu to Farmer (Aug. 11, 1992), *reprinted in* J.A. 52–53.

In his letter to Farmer, Moritsugu recited the BOP's general medical policy, as described above. He then proceeded to address briefly each potential form of treatment for transsexualism. As to hormones, Moritsugu stated that Farmer was not on hormones when she arrived in the federal prison system, and that he had not received a request for such treatment from the medical personnel of the facility in which she was incarcerated. As to castration, Moritsugu again emphasized that he had not received a recommendation for such treatment from the relevant medical personnel, and added that he would only consider authorizing castration if it was clinically necessary, rather than simply "a cosmetic procedure or a procedure to further transsexual change." J.A. 52. Finally, as to psychotherapy, Moritsugu observed that Farmer had received counseling, but that her transsexualism was a "general emotional state," which did "not present a specific mental health problem that mental health personnel [could] isolate for treatment." *Id.* at 52–53. He concluded by stating that mental health personnel were available to assist Farmer if she had "specific needs." *Id.* at 53.

Farmer claims to have written Moritsugu on four subsequent occasions, requesting that he reconsider his decision. Moritsugu, however, does not acknowledge receiving, and did not respond to, any of these alleged letters.

### B. Farmer's Lawsuit

On May 15, 1996, Farmer filed the instant lawsuit in District Court, naming Kathleen Hawk, in her official capacity as Director of the BOP, and Moritsugu, in both his official and individual capacities. Farmer's complaint sought damages against Moritsugu pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging, *inter alia*, that Moritsugu violated her Eighth Amendment rights by failing "to promulgate any policy which would have required the BOP medical staff to provide [her] with treatment for transsexualism," and by failing to "direct the BOP medical staff to provide [her] with treatment for transsexualism." Second Amended Complaint ¶¶ 53–54, *reprinted in* J.A. 37.

Defendants moved to dismiss or, in the alternative, for summary judgment, arguing, *inter alia*, that Moritsugu was entitled to qualified immunity on the claim for damages asserted against him in his individual capacity. The District Court granted in part and denied in part defendants' motion. *See Farmer v. Hawk*, 991 F.Supp. 19, 28 (D.D.C. 1998). As relevant to the present action, the trial court first determined that, at the time of Moritsugu's letter to Farmer, it was clearly established that transsexualism was a serious medical condition entitling Farmer to some form of treatment. *See id.* at 25–27. With regard to Moritsugu's alleged failure to promulgate a new policy for treatment of transsexuals, the court found that the BOP's current policy is constitutional on its face, and, therefore, that Moritsugu's failure to issue a new policy could not have been deliberately indifferent. *See id.* at 27. However, with regard to Moritsugu's alleged failure to enforce adequately the existing policy to secure treatment for Farmer, the trial court concluded that Moritsugu's response to Farmer's requests "could very possibly have constituted deliberate indifference," because his letter "acknowledge[d] and sanction[ed] the withholding of any treatment from Farmer." *Id.* at 28. Thus, the court held that Moritsugu was not entitled to immunity on this claim. *See id.* This appeal, which con-

cerns solely the question of Moritsugu's liability in his individual capacity, followed.

## II. Analysis

### A. Qualified Immunity Principles

■ It is well-established that qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Where an official's conduct is objectively reasonable in light of existing law, that official will enjoy protection from liability. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Where, however, "an official could be expected to know that certain conduct would violate statutory or constitutional rights," that official may be vulnerable to suit by one who suffers injury resulting therefrom. *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. In short, "[a]n official is ... entitled to summary judgment [on qualified immunity grounds] unless '[t]he contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood] that what he [was] doing violate[d] that right.'" *Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C.Cir.1991) (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034).

■ By "provid[ing] government officials with the ability reasonably to anticipate when their conduct may give rise to liability for damages," *Anderson*, 483 U.S. at 646, 107 S.Ct. 3034 (citation and internal quotation marks omitted), the doctrine of qualified immunity strikes a balance between compensating those injured by official conduct and protecting the Government's basic ability to function. *See Harlow*, 457 U.S. at 813–14, 102 S.Ct. 2727. In other words, qualified immunity is designed to mitigate the social costs of exposing government officials to personal liability—costs such as "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at 816, 102 S.Ct. 2727; *see also Harris*, 932 F.2d at 13. To this end, qualified immunity provides not simply a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

### B. Appellate Jurisdiction

■ The present matter comes to us on interlocutory appeal from the District Court's denial of Moritsugu's motion for summary judgment on the basis of qualified immunity. *See Farmer v. Hawk*, 991 F.Supp. at 28. We begin our analysis, therefore, by considering whether we have jurisdiction to decide this appeal.

Pursuant to 28 U.S.C. § 1291, we have jurisdiction over appeals from "final decisions of the district courts." A denial of summary judgment is ordinarily not "final," because it simply sends a case to trial. However, under a settled application of the "collateral order doctrine," *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), an appeal from a denial of summary judgment on the ground of qualified immunity may be susceptible to immediate appeal. *See Mitchell*, 472 U.S. at 530, 105 S.Ct. 2806.

Because immunity from the burdens of litigation "is effectively lost if a case is erroneously permitted to go to trial," *id.* at 526, 105 S.Ct. 2806, the policies underlying qualified immunity favor resolution of immunity claims prior to full discovery, and, therefore, support immediate appeal of an order denying immunity. *See id.* at 526–30, 105 S.Ct. 2806. Collateral order principles do not, however, permit an immediate appeal merely because a defendant asserted, but was denied, qualified immunity. *See Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Rather, the Supreme Court has distinguished between appeals raising "abstract" legal issues—*i.e.*, "whether the facts alleged ... support a claim of violation of clearly established law," *Mitchell*, 472 U.S. at 528 n. 9, 105 S.Ct. 2806—and appeals challenging evidentiary sufficiency—*i.e.*, whether the summary judgment record raises genuine issues of fact for

trial. *See Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). As we see it, this precedent draws a critical line between appeals of the "I cannot, as a matter of law, be held liable" variety and appeals of the "I did not, as a matter of fact, do it" variety. The former is permitted, notwithstanding the absence of a final judgment in the case, *see Mitchell,* 472 U.S. at 530, 105 S.Ct. 2806; the latter, however, is not. *See Johnson,* 515 U.S. at 313, 115 S.Ct. 2151.

We find that the instant appeal falls on the permissible side of this line. The District Court found that material issues of fact remain in dispute, including the question of whether Farmer actually received any treatment for her transsexualism. *See Farmer v. Hawk,* 991 F.Supp. at 27, 30. Moritsugu's challenge, however, does not go to this finding. The crux of Moritsugu's appeal is that, even assuming the facts as presented by Farmer, he could not have violated her Eighth Amendment rights, because he adhered to the BOP's constitutional medical policy, which does not charge him with responsibility for the diagnosis and treatment of individual patients. *See* Brief for Appellant at 9. In short, Moritsugu has effectively conceded the facts as alleged by Farmer, contesting instead whether those facts could support a conclusion that he violated Farmer's constitutional rights. This case, therefore, "concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[ ] a violation of 'clearly established' law." *Johnson,* 515 U.S. at 311, 115 S.Ct. 2151 (citing *Mitchell,* 472 U.S. at 528, 105 S.Ct. 2806). Accordingly, we have jurisdiction to hear and decide this appeal.

*C. Moritsugu's Qualified Immunity Claim*

■ We turn now to the merits of Moritsugu's qualified immunity claim. We review the District Court's denial of summary judgment *de novo,* applying the same legal standard that governed the District Court's determination. *See National Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1128 (D.C.Cir.1997).

Moritsugu is protected by qualified immunity unless Farmer's allegations could sustain a finding that his conduct violated clearly established law. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. The "clearly established law" upon which Farmer's contentions rest is the Eighth Amendment's proscription against "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prison official who "knows of and disregards an excessive risk to inmate health or safety" is deliberately indifferent for these purposes. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The only question presently before us, then, is whether, viewing the record in the light most favorable to Farmer, Moritsugu's conduct could have constituted deliberate indifference to Farmer's medical needs.

In Farmer's view, Moritsugu was deliberately indifferent, because, in the face of her repeated requests for some type of treatment, he responded with only a single letter explaining the BOP's policy and finding that she had not established an entitlement to treatment thereunder. The bottom line, Farmer contends, is that Moritsugu was aware of, yet ordered no treatment for, her medical condition. *See* Brief of Appellee at 11. The District Court agreed, finding that Moritsugu effectively "sanction[ed]" the withholding of treatment from Farmer. *Farmer v. Hawk,* 991 F.Supp. at 28. We find, however, that Farmer's claims imply an obligation falling well outside the scope of Moritsugu's role as Medical Director, and, moreover, that Moritsugu's response to Farmer's requests comported with constitutional BOP medical policy. Thus, we conclude that Moritsugu's conduct met the standard of "objective legal reasonableness" required to support qualified immunity. *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727.

There is no dispute here that the BOP's medical policy specifically speaks to the treatment of transsexualism. *See* HEALTH SERVICES MANUAL, Ch. 5, § 14, *reprinted in* J.A. 64. Moreover, although Farmer originally challenged both the BOP's medical policy and its application to her, the District Court found that the policy is constitutional on its face. *See Farmer v. Hawk,* 991 F.Supp. at 27. Farmer has not contested this finding on appeal. We deem it unnecessary to reach the question of whether or not

transsexualism is a serious medical condition, therefore, because even assuming that it is, adherence to the policy would, *a fortiori,* be constitutional.

The parties agree, moreover, that, pursuant to this concededly constitutional policy, only three treatment options were potentially available in this case: hormone therapy, castration, and psychotherapy. Throughout this litigation, Farmer has recognized that she is not entitled to any particular treatment of her choosing. *See* Brief for Appellee at 4. At oral argument, counsel also conceded that hormone therapy and castration are not realistically at issue in this case, *i.e.,* Farmer cannot pin a claim of deliberate indifference on Moritsugu's failure to order these treatments. We agree, and find nothing in the record to suggest otherwise.

The only remaining question, then, is whether Moritsugu was deliberately indifferent to Farmer's need for psychotherapy. We find that he was not, as Farmer has failed to establish any "need" for psychotherapy of which Moritsugu was aware and to which he was indifferent. Farmer apparently relies on the simple fact of her diagnosis to support her need for counseling. Yet, this is plainly inadequate: merely because someone is a transsexual, it does not inexorably follow that he or she needs psychotherapy. Even the fact that Farmer received some counseling in the past does not necessarily demonstrate her present need for that treatment. Indeed, it appears undisputed that, under the established BOP policy, Farmer had no *guarantee* of psychotherapy for transsexualism absent a demonstrated need.

Quite apart from whether Farmer had a need for psychotherapy, the most important point in this case is that Moritsugu is not the person within the BOP who determines whether psychotherapy is required in a given case. As Medical Director, overseeing operations in facilities nationwide from his office in Washington, D.C. , Moritsugu does not diagnose individual patients; nor does he prescribe treatments for particular patients, except insofar as he may be called upon to approve the recommendation of a treating physician. Such determinations are made at the local level, *i.e.,* within individual BOP institutions. In short, Farmer's pleas to Moritsugu were plainly misguided. The ap-

propriate recourse was, first and foremost, through the local medical personnel who were responsible for Farmer's treatment decisions. If Farmer was dissatisfied with local medical treatment, she had recourse to grievance and appeal procedures pursuant to which she could contest any failures in medical care. There is no claim here that these grievance procedures were legally inadequate.

Obviously, Farmer preferred to seek relief from the head of the operation, apparently on the mistaken assumption that the boss can cure all ills. It is unimaginable, however, that Moritsugu should be available to intervene in established processes on behalf of every BOP inmate who happens to be dissatisfied with his or her medical treatment. This is particularly true where, as here, the requests were completely unsupported by treatment records or recommendations from local medical personnel establishing a need for treatment. It is clear that Moritsugu's role as Medical Director neither required nor countenanced his involvement in Farmer's case.

On its face, Moritsugu's August 11 letter simply confirms the obvious. To be sure, Moritsugu did, perhaps unnecessarily, comment directly upon issues pertaining to Farmer's medical care. Implicit in his letter, however, was the strong message that Farmer's requests were misdirected. He stated that he had not received requests from local medical personnel to treat Farmer with hormones or castration, but that mental health personnel were available to assist her should she have specific needs for psychotherapy. *See* J.A. 52–53. The bottom line is apparent: as far as Moritsugu could tell, Farmer had not demonstrated any need for treatment, and it was not his role to ascertain this need. Under these circumstances, the letter reflected little more than Moritsugu's adherence to the BOP's medical policy, pursuant to which he was not directly involved in decisions concerning Farmer's care. Even Farmer's counsel, when questioned at oral argument, acknowledged that her client could not win an Eighth Amendment claim on the basis of Moritsugu's letter alone.

Thus, we find that Moritsugu is entitled to qualified immunity, for there is nothing else in the record on which to pin deliberate indifference. Farmer emphasizes that her claims rest not on any isolated occurrence, such as Moritsugu's August 11 letter, but rather on Moritsugu's persistent failure, in the face of her ongoing requests, to ensure that she receive any treatment. However, the mere fact that Farmer wrote to Moritsugu on multiple occasions does not change the outcome, because Moritsugu was never the person to whom these matters should have been addressed in the first place. Farmer's claims, unsupported by evidence of a medical need for psychotherapy, did not trigger any obligation on the part of Moritsugu to conduct an independent investigation into her medical condition and treatment. Farmer's implications in this regard, therefore, fail to appreciate Moritsugu's limited role, under the BOP's constitutional medical policy, in treatment decisions properly made by physicians in local institutions. In light of these factors, we hold that Moritsugu's conduct was objectively reasonable.

We add, as a final note, that exposing Moritsugu to personal liability in these circumstances would be totally at odds with the policies underlying the doctrine of qualified immunity. *See Harlow,* 457 U.S. at 806, 814, 102 S.Ct. 2727. If Moritsugu is liable in a case such as this, he is, in effect, liable for all alleged mistakes in the individual diagnoses of every inmate in the BOP system, simply by virtue of an inmate's complaint. Such an outcome is untenable. This is not to say that we can envision no circumstances under which Moritsugu could have been deliberately indifferent to an inmate's medical needs. However, we simply cannot imagine how the Medical Director in Washington, D.C. could be expected to formulate treatment regimes for prisoners throughout the system on the basis of essentially undocumented complaints charging inadequate care. And, if the weight of such an assignment were not problematic enough, the risk of personal liability would make it virtually impossible for the Government to fill positions such as Moritsugu's, as few qualified doctors would be willing to assume this responsibility with the accompanying risks of liability. The Government cannot be expected to operate in this way,

and high government officials cannot be expected to assume this type of liability.

### III. CONCLUSION

For all of the foregoing reasons, we find that Moritsugu is entitled to qualified immunity on Farmer's Eighth Amendment claims against him in his individual capacity. Accordingly, we reverse the District Court's denial of summary judgment in his favor.

*So ordered.*