Mark L. BROOKS a/k/a Jessica
M. Lewis, Plaintiff,

v.

Stan BERG, Assistant Deputy Superintendent, Clinton Correctional Facility; Daniel Senkowski, Superintendent, Clinton Correctional Facility; Thomas Eagen, Director of Inmate Grievance; Florence Kaufman; Helen Worley, Supervisor of Inmate Grievance; John Doe # 1, Staff, Mental Health Satellite Unit; John Doe # 2, Staff, Mental Health Satellite Unit; John Doe # 3, Staff, Mental Health Satellite Unit, Defendants.

No. 00–CV–1433.

United States District Court,
N.D. New York.

July 15, 2003.

Mark L. Brooks, a/k/a Jessica M. Lewis, Plaintiff Pro Se, Clinton Correctional Facility, Dannemora, NY.

Eliot Spitzer, Attorney General of New York, Department of Law, Albany, NY, Sean M. Seeley, Assistant Attorney General, of Counsel.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

## I. Background

### A. Facts

Plaintiff Mark L. Brooks a/k/a Jessica M. Lewis ("Plaintiff") is an inmate at Clinton Correctional Facility ("Clinton"), where he[1] is housed in the Assessment

---

1. The Court recognizes that Plaintiff prefers to be referred to with female pronouns. However, because Plaintiff is a biological male, the Court has decided to use male pronouns.

Program and Preparation Unit (APPU).[2] Plaintiff is a biological male who claims to suffer from gender identity disorder (GID) (also known as gender dysphoria or transsexualism). The Supreme Court has explained that transsexuals have " '[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex,' and ... typically seek[ ] medical treatment, including hormone therapy and surgery, to bring about a permanent sex change." *Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting American Medical Association, Encyclopedia of Medicine 1006 (1989)).

Plaintiff "believes that she has the gender identity of a female and can find comfort only through living and presenting as a female." Complaint ¶ 7. While Plaintiff has been aware of his female identity since childhood, he first became familiar with GID in prison. *Id.* ¶ 11. After immersing himself in literature on GID, Plaintiff became convinced that he is a transsexual. *Id.* "In 1998, Plaintiff realized that no amount of research and knowledge would ease her suffering, and she decided to seek treatment." *Id.* ¶ 12.

On August 25, 1998, Plaintiff sent a letter to Florence Kaufman, who Plaintiff believed to be a psychiatrist or psychologist. *Id.* ¶ 13. Plaintiff explains that he attempted to contact Kaufman because GID is considered a mental health problem and treatment for GID generally begins with diagnostic psychotherapy. *Id.* Plaintiff claims that he never received a response to the August 25 letter. *Id.* ¶ 14.

On September 21, 1998, Plaintiff sent a letter to the Mental Health Satellite Unit at Clinton, addressed simply to the "Satellite Unit." *Id.* ¶ 15. Plaintiff did not receive a response. *Id.* Over the next six months Plaintiff sent several more letters to the Satellite Unit, but all went unanswered. *Id.* ¶¶ 16–18. "Not one single letter from August 1998, through February 1999, was answered. No diagnosis was given, no treatment was provided, plaintiff was never seen by any medical staff from any facility medical or mental health departments, and no reasons were offered for the obvious outright denial of treatments." *Id.* ¶ 18.

On March 1, 1999, Plaintiff sent a letter to Stan Berg, the supervisor of the APPU. *Id.* ¶ 20. In his letter, Plaintiff informed Berg that he had unsuccessfully sought treatment for GID and asked Berg to intervene on his behalf. *Id.* ¶ 20. Plaintiff did not receive a response to the March 1 letter and on April 12, 1999, he sent Berg a second letter requesting treatment.

On September 12, 2000, after exhausting his administrative remedies, Plaintiff filed the instant complaint pursuant to 42 U.S.C. § 1983. In his first cause of action, Plaintiff alleges that Defendants[3] failed to provide him with necessary medical treatment for his serious medical need in violation of the Eighth Amendment. Plaintiff's second cause of action alleges that Defen-

---

**2.** The Second Circuit has described the APPU as follows:

> The APPU ... offers a "diagnostic and treatment program" to help victim-prone or fearful individuals develop inner strength and coping skills so as to be able to move back into the general population. The Unit has a variety of programs available to inmates, including an academic program, psychological counseling, and three vocational shops.

*Hall v. Unknown Named Agents of New York State Dep't for Correctional Services for APPU at Clinton Prison*, 825 F.2d 642, 644 (2d Cir. 1987).

**3.** Plaintiff names the Mental Health Satellite Unit employees who are responsible for receiving and distributing incoming mail as John Does. Complaint ¶ 19

dants violated his due process rights by improperly handling his inmate grievance concerning the denial of medical treatment. Plaintiff asks this Court, *inter alia,* to issue an injunction ordering Defendants to provide him "with all of the necessary medical treatments, primary and secondary, for the adequate and proper treatment of Transsexualism (Gender Identity Disorder)," and to award him compensatory and punitive damages. Complaint ¶ 29A.

Defendants moved for summary judgment and the Honorable Gustave J. Di-Bianco, United States Magistrate Judge, prepared a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. The Magistrate Judge found that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. The Magistrate Judge also determined that Defendants Kaufman, Berg, and the John Does were not personally involved in the alleged violations of Plaintiff's constitutional rights. The Magistrate Judge found that Plaintiff's due process rights were not violated. Finally, the Magistrate Judge found that all Defendants were protected by qualified immunity. Plaintiff filed objections to the Report–Recommendation on October 30, 2002. After leave of the Court was granted, Plaintiff filed supplemental objections on March 27, 2003.

## B. DOCS Policy On Estrogen Therapy for Gender Dysphoria

Defendants have submitted a Department of Correctional Services (DOCS) policy bearing the subject "Estrogen Therapy for Gender Dysphoria." *See* DOCS Health Services Policy Manual § 1.31, Defendants' Ex. J. Section 1.31 of the DOCS Health Services Policy Manual states: "The New York State Department of Correctional Services continues treating inmates for Gender Dysphoria identified prior to incarceration." *Id.* Under this policy, inmates who can prove that they received hormone therapy prior to incarceration may be eligible for continued hormone therapy. The policy further states that "[d]uring incarceration transsexual surgical operations are not honored." *Id.*

## C. Nature of the Complaint and Relief Sought

Before turning to the merits of Defendants' motion, it is important to note that Plaintiff's requests for treatment have been misconstrued by the prison officials who addressed his inmate grievance and by Defendants in defending against this action. In his inmate grievance, Plaintiff requests "all of the minimal, though appropriate treatments and all necessary examinations/testing." *See* Inmate Grievance Complaint, attached to Complaint. While Plaintiff indicated that he believed that the appropriate treatment would include electrolysis, vocal chord modulation, breast implant surgery, and sex reassignment surgery, a qualified medical professional would obviously determine what treatment was "minimal, though appropriate." The Inmate Grievance Resolution Committee (IGRC) answered Plaintiff's grievance with the following response: "The Committee advises grievant that per DOCS policy, cosmetic surgery will not be performed unless it is medically required." *See* Memo from I.G.R.C. to M. Brooks at 2, attached to Complaint. The IGRC thus reduced Plaintiff's request for "all of the minimal, though appropriate treatments" to a demand for cosmetic surgery.

The IGRC's decision was appealed to Superintendent Senkowski, who denied Plaintiff's appeal. On the form denying Plaintiff's appeal, the title of Plaintiff's grievance is inaccurately listed as "Wants genital reassignment." As grounds for the denial, the Superintendent stated:

Information provided by Medical reveals that there is no record of grievant receiving any treatment in this area of concern. The body altering requests are not provided.

Grievant is advised to address his medical issues to that department.

Denial of Appeal, attached to Complaint. Again, Plaintiff's request that prison officials intervene to arrange for him to receive some medical treatment is reduced to "body altering requests."

In his appeal of the Superintendent's decision to the Central Office Review Committee (CORC), Plaintiff clearly states that he is not demanding sex reassignment surgery; rather, he is requesting all treatment determined by medical professionals to be necessary: "[T]he nature of the grievance argued that I was never even seen by medical staff, which prevented them from determining whether or not such treatment was necessary in my case specifically." Appeal to the CORC, dated June 14, 1999, attached to Complaint. Plaintiff never received a response from the CORC.

In this action, Defendants misread Plaintiff's complaint to "assert[ ] that [Plaintiff] should have received treatment for [GID] in the form of gender reassignment surgery and hormonal therapy" and to demand that Defendants "provide hormonal therapy along with gender reassign-

ment surgery and various other surgical procedures." *See* Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 1. Instead, Plaintiff's Complaint actually alleges that Defendants violated his Eighth Amendment rights because they "fail[ed] to provide any treatment at all, including diagnostic examinations." Complaint ¶ 27A. He demands "all necessary medical treatment." Complaint ¶ 29A. While Plaintiff wishes to receive hormone therapy and undergo sex reassignment surgery,[4] whether a given treatment is medically necessary can be determined only by a qualified medical professional. Accordingly, the Court emphasizes that it is not being asked to determine precisely how Plaintiff should be treated.[5] Instead, Plaintiff is asking the Court to force Defendants to allow him to see a doctor who is qualified to propose a course of treatment.

## II. Discussion

### A. Standard of Review of the Report–Recommendation

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A judge of the court may accept, reject, or modify, in

---

**4.** In his Complaint, Plaintiff suggests that "necessary medical treatment" includes electrolysis, hormone therapy, vocal chord modulation surgery, and sex reassignment surgery. Complaint ¶ 29A.

**5.** Cases involving transsexual inmates reflect some disagreement as to the proper treatment of GID. *Compare Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir.1997) ("The cure for the male transsexual consists not of psychiatric treatment designed to make the patient content with his biological sexual identity-that doesn't work-but of estrogen therapy designed to create the secondary sexual characteristics

of a woman followed by the surgical removal of the genitals and the construction of a vagina-substitute out of penile tissue.") (citing American Medical Association, Encyclopedia of Medicine 896 (1989); 4B James G. Zimmerly, Lawyers Medical Cyclopedia of Personal Injuries and Allied Specialities § 31.33b (3d ed.1992)) with *Kosilek v. Maloney*, 221 F.Supp.2d 156, 158 (D.Mass.2002) (noting that according to "protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders ... psychotherapy with a qualified therapist is sufficient treatment for some individuals").

whole or in part, the findings or recommendations made by the magistrate." *Id.*

## B. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, courts must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir.2001)).

Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

## C. Due Process

█ Plaintiff alleges that the manner in which his grievance was handled by prison officials violated his due process rights. In support of this claim, Plaintiff states that he was not allowed to attend the grievance hearing or present any additional evidence and that the IGRC's decision was untimely. The Court agrees with the Magistrate Judge's determination that summary judgment should be granted in favor of Defendants as to this claim. "Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment." *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (citations omitted). "When an inmate sets forth a constitutional claim in a grievance to prison officials and the grievance is ignored, the inmate has the right to directly petition the government for redress of that claim. *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983. *Id.*" *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29 2002). The allegations in Plaintiff's complaint thus fail to rise to the level of a due process violation.

## D. Inadequate Medical Treatment

### 1. Personal Involvement

█ It is well-established that personal involvement is required for the assessment of damages in a § 1983 action. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 165 (2d Cir.2001).

█ The personal involvement of a supervisory defendant is established where:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of

such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted). The receipt of inmate complaints, without more, is insufficient to establish an official's supervisory liability. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citations omitted). "Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* (citations omitted).

**a. Defendants Kaufman, Eagan, John Doe # 1, John Doe # 2, John Doe # 3.** The Court finds that summary judgment should be granted to Defendants Kaufman, Eagen, John Doe # 1, John Doe # 2, and John Doe # 3 for lack of personal involvement. At most, Plaintiff alleges that these Defendants failed to respond to his letters.

**b. Defendant Worley.** Plaintiff's allegations concerning Defendant Worley are far to vague to support a finding that she was personally involved in denying Plaintiff medical treatment. In particular, Plaintiff does not adequately explain Worley's role as "grievance supervisor." Accordingly, summary judgment is also granted to Defendant Worley.

■ **c. Defendant Berg.** The Court finds that there is a dispute as to the facts surrounding Berg's involvement in the denial of Plaintiff's medical treatment. Berg has submitted no evidence showing that he was not responsible for determining whether Plaintiff should receive treatment for GID. Berg has submitted evidence that he asked William Crosier, the Unit Chief

of the Mental Health Satellite Unit to "arrange for [Brooks] to see someone" regarding his "gender identity crises." *See* Defendants' Ex. D. This indicates that it may have been Berg's duty to respond to Plaintiff's request for treatment. Berg's memo to Crosier does not establish that Berg fulfilled this duty because the memo is dated August 24, 1998–one day before Plaintiff sent his first request for treatment to Florence Kaufman and more than six months before Plaintiff sent a letter directly to Berg. In other words, it appears that while Berg may have been responsible for ensuring that Plaintiff received appropriate treatment, he failed to respond to Plaintiff's requests for treatment in March and April 1999.

Plaintiff may also be able to establish Berg's supervisory liability. If Berg failed to make any effort to determine whether Crosier complied with his direction to arrange for Plaintiff to see someone, Berg may have been grossly negligent in supervising Crosier. In addition, Plaintiff was denied all medical treatment for GID in accordance with Section 1.31 of the DOCS Health Services Policy Manual. As discussed more fully below, it appears that this policy sanctions unconstitutional practices. The copy of the policy which Defendants have submitted to the Court indicates that the policy was "approved by" Berg. *See* Defendants' Ex. J. Accordingly, it appears that Berg may have created this policy or allowed it to continue. Defendants have thus failed to establish as a matter of law that Berg was not personally involved in the alleged violation of Plaintiff's constitutional rights.

■ **d. Defendant Senkowski.** Plaintiff claims that Defendant Senkowski was personally involved in the denial of medical treatment because Senkowski denied his appeal from the IGRC's decision and thereby acted on his grievance. While this

denial is on a form that appears to be from Senkowski, the signature in the box marked "Superintendent's Signature" is illegible. It seems that the form was actually signed by a Deputy Superintendent. Defendants contend that because Senkowski delegated the appeal to this Deputy Superintendent, Senkowski is not personally involved in the denial of Plaintiff's appeal. However, Defendants have failed to describe precisely what role Senkowski played in the denial of the appeal. In particular, Defendants have not explained how inmate appeals are delegated and they have not submitted any evidence establishing that Senkowski did not review and approve of the denial of Plaintiff's appeal. Accordingly, Defendants have failed to establish as a matter of law that Senkowski was not personally involved in the violation of Plaintiff's constitutional rights.

## 2. Alleged Inadequate Medical Treatment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII. "This includes punishments that 'involve the unnecessary and wonton infliction of pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotation marks omitted). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*,

316 F.3d 178, 183–84 (2d Cir.2003) (citations omitted).

■ When determining whether an inmate has serious medical needs, courts look to the following factors: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance*, 143 F.3d at 702).

"An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).

### a. Serious Medical Need

Several courts have held that GID is a serious medical need. *See Wolfe v. Horn*, 130 F.Supp.2d 648, 652 (E.D.Pa.2001) ("Courts have consistently considered transsexualism a 'serious medical need' for purposes of the Eighth Amendment.") (citations omitted); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir.2000) (assuming for the purposes of appeal that transsexualism is a serious medical need); *Brown v. Coombe*, No. 96–CV–476, 1996 WL 507118, at *3 (N.D.N.Y. Sept.5, 1996) ("In a particular prisoner, gender dysphoria may be a serious medical need.") (citations omitted). The District Court for the District of Massachusetts recently stated that "[a] gender identity disorder is not ... necessarily a serious medical need for which the Eighth Amendment requires treatment." *Kosilek*, 221 F.Supp.2d at

184. The Court explained that milder gender identity disorders can be treated without resort to psychotherapy, hormone treatment, or sex reassignment therapy. *Id.* In this case, Defendants have not argued that Plaintiff's GID is not a serious medical need.

### b. Deliberate Indifference

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citation omitted). Courts have found that under the Eighth Amendment inmates with GID must receive *some* form of treatment. *See Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987) (holding that plaintiff inmate with GID states a proper Eighth Amendment claim by alleging that defendants denied her all treatment and noting that "she does not have a right to any particular type of treatment, such as estrogen therapy"); *Wolfe,* 130 F.Supp.2d at 653 (denying defendants' motion for summary judgment in part because there was a question of fact as to whether inmate received any treatment for GID); *Brown,* 1996 WL 507118, at *4 n. 3 ("I caution defendants that if plaintiff does indeed suffer from gender dysphoria, they must provide treatment although not necessarily hormone therapy.") (citation omitted).

In addition, courts have held that the treatment plan for an inmate with GID must be formulated by a medical professional and not by prison administrators. In *Allard v. Gomez,* 9 Fed. Appx. 793, 2001 WL 638413, at *1 (9th Cir. June 8, 2001), the Ninth Circuit reversed a grant of summary judgment in favor of the defendants because there was a question of fact as to whether the plaintiff, an inmate with GID, was denied hormone treatment recommended by a doctor "on the basis of an individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to [the inmate's] medical needs." Similarly, the District Court for the District of Massachusetts held that the treatment of an inmate with GID was inadequate when "no informed medical judgment has been made." *Kosilek,* 221 F.Supp.2d at 158. These decisions are consistent with *Chance,* in which the Second Circuit suggested that the medical treatment of inmates must be based on "sound medical judgment." *Chance,* 143 F.3d at 704.

█ Defendants do not contest Plaintiff's claim that he was never treated for GID notwithstanding numerous requests for treatment. In addition, Defendants have not provided the Court with any evidence showing that the decision to refuse Plaintiff treatment was based on sound medical judgment. Finally, Defendants have failed to submit any evidence that they were not aware that Plaintiff's health could be jeopardized if treatment was refused. Accordingly, the Court finds that Defendants have failed to establish, as a matter of law, that Plaintiff was provided adequate treatment for his serious medical needs.

### E. Qualified Immunity

"Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002) (citations omitted). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533

U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

The Supreme Court recently explained that when considering a defendant's assertion of qualified immunity, courts must first address the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the officer's conduct violated a constitutional right, the Court must then determine whether the right was "clearly established" when the violation occurred. *Id.* A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151 (citations omitted).

The Court has already found, *supra*, that the facts alleged in Plaintiff's complaint, if true, show that Defendants violated Plaintiff's Eighth Amendment rights. Accordingly, the Court turns to the second step of the qualified immunity inquiry: whether this right was clearly established at the time of the alleged violation. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition...." *Id.* at 201, 121 S.Ct. 2151. The relevant question is not whether it was clearly established that Plaintiff has Eighth Amendment rights. Rather, the Court must ask "whether the state of the law [at the time of the alleged constitutional violation] gave [Defendants] fair warning that their alleged treatment of [Plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

The absence of binding precedent squarely addressing the facts presented in this case does not inexorably lead to the conclusion that the constitutional right allegedly violated here was not clearly established. Neither the Supreme Court nor the Second Circuit has held that a transsexual inmate has an Eighth Amendment right to see a medical professional able to prescribe some medical treatment. However, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* (internal quotations omitted). Consequently, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

■ Defendants contend that they are entitled to qualified immunity because it was objectively reasonable for them to believe that their actions did not violate the Eighth Amendment. In particular, Defendants assert that the refusal to provide any medical treatment to Plaintiff was objectively reasonable because such conduct comports with DOCS policy.[6] Although Defendants fail to cite a case in support of this argument, courts have found that a defendant's claim of qualified immunity is bolstered by evidence that he was following orders when he acted unconstitutionally. *See, e.g., Lauro v. Charles*, 219 F.3d 202, 216 n. 10 (2d Cir.2000). This does not mean that a defendant is entitled to qualified immunity whenever he engages in conduct that is sanctioned by his supervisors. As the Supreme Court explained, a policy "could not make reasonable a belief that was contrary to a decided body of case law." *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Accordingly, the Second Circuit has held that defendants who act pursuant to a facially invalid policy are not entitled

---

6. The Court notes that Berg's reliance on the DOCS policy cannot establish his qualified immunity if the evidence shows that he promulgated the policy.

to qualified immunity. *See Walsh v. Franco*, 849 F.2d 66, 69–70 (2d Cir.1988) (affirming district court's denial of summary judgment on qualified immunity grounds where plaintiff was strip searched in accordance with a prison's blanket policy of conducting strip searches of all misdemeanor arrestees); *Diamondstone v. Macaluso*, 148 F.3d 113, 126 (2d Cir.1998) (finding that defendant police officer who ticketed motorist after traffic court rulings established that the ticketing was improper was not entitled to qualified immunity simply because his superiors directed him to continue the ticketing).

As noted above, Section 1.31 of the DOCS Health Services Policy Manual provides for the continued treatment of inmates who were diagnosed with GID prior to incarceration. The policy's silence regarding the treatment of transsexual inmates who were not diagnosed with GID prior to incarceration is apparently read by prison officials to indicate that DOCS will not provide any treatment to these inmates. While Defendants rely heavily on this policy as justification for their actions, they do not explain the puzzling distinction that the policy makes between those inmates who were diagnosed before incarceration and those who were diagnosed after being incarcerated. Surely inmates with diabetes, schizophrenia, or any other serious medical need are not denied treatment simply because their conditions were not diagnosed prior to incarceration.

One explanation for the distinction may be found in cases dealing with the treatment of transsexual inmates who were taking hormones before being incarcerated. *See Phillips v. Michigan Dept. of Corrections*, 731 F.Supp. 792 (W.D.Mich.1990);

*Wolfe*, 130 F.Supp.2d at 653. The abrupt cessation of hormone therapy can "wreak havoc on [the inmate's] physical and emotional state." *Phillips*, 731 F.Supp. at 800. Accordingly, courts have held that prisons which refuse to provide hormones to inmates who were taking hormones before they were incarcerated may violate the Eighth Amendment. *Phillips*, 731 F.Supp. at 800; *Wolfe*, 130 F.Supp.2d at 653. Section 1.31 thus may be aimed at instructing prison officials to maintain hormone treatment which began prior to incarceration. Nevertheless, the effect of the policy has been to deny all treatment for transsexual inmates who cannot establish that they were diagnosed with GID prior to incarceration.

This blanket denial of medical treatment is contrary to a decided body of case law. Prisons must provide inmates with serious medical needs some treatment based on sound medical judgment. There is no exception to this rule for serious medical needs that are first diagnosed in prison. Prison officials are thus obliged to determine whether Plaintiff has a serious medical need and, if so, to provide him with at least some treatment. Prison officials cannot deny transsexual inmates all medical treatment simply by referring to a prison policy which makes a seemingly arbitrary distinction between inmates who were and were not diagnosed with GID prior to incarceration. In light of the numerous cases which hold that prison officials may not deny transsexual inmates all medical attention, especially when this denial is not based on sound medical judgment, the Court finds that Defendants have failed to establish as a matter of law that their actions were objectively reasonable.[7]

---

[7]. The Court recognizes that a contrary conclusion was reached in *Kosilek v. Nelson*, No. C.A. 92–12820, 2000 WL 1346898 (D.Mass. Sept.12, 2000) (holding that "at least since 1996, it has not been clearly established that a transsexual has a constitutional right to any therapy or treatment while incarcerated") (citing *Long v. Nix*, 86 F.3d 761, 765 n. 3 (8th Cir.1996); *Maggert*, 131 F.3d at 671; *Farmer v. Moritsugu*, 163 F.3d 610, 614–15 (D.C.Cir. 1998)). In the Court's view, the cases cited in

## III. Conclusion

Accordingly, it is hereby

ORDERED, that Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's due process claim and as to his Eighth Amendment claims against Defendants Kaufman, Eagen, Worley, John Doe # 1, John Doe # 2, and John Doe # 3, and **DENIED** in all other respects; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

*Kosilek* do not undermine the Court's refusal to find that Defendants are entitled to qualified immunity.

In *Long,* the Eighth Circuit noted that a prior ruling that transsexualism is a serious medical "may be in doubt in light of *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and subsequent cases." *Long,* 86 F.3d at 765 n. 3. The Court did not pursue this issue, however, because it was undisputed that the plaintiff was not a transsexual. *Id.* In addition, *Long* did not involve the denial of all medical treatment. *See id.* at 765 (noting that the "record is full of evidence of the attempts of the prison medical staff to evaluate Long's psychological problems and Long's refusal to cooperate").

In *Maggert,* the Seventh Circuit stated that "except in exceptional circumstances that we do not foresee, the Eighth Amendment does not entitle a prison inmate to curative treatment for his gender dysphoria." *Maggert,* 131 F.3d at 672. This dicta was based on the conclusion-rejected in *Kosilek,* 221 F.Supp.2d at 192–that the only effective treatment for GID is hormone therapy and sex reassignment surgery. *Maggert,* 131 F.3d at 671; *see also supra* note 5.

In *Farmer v. Moritsugu,* the D.C. Circuit held that the defendant, the Medical Director of the Bureau of Prisons, was entitled to qualified immunity because he was not responsible for diagnosing and treating the plaintiff. *Moritsugu,* 163 F.3d at 615. In addition, the Court noted that the plaintiff had undergone counseling and that "mental health personnel were available to assist her should she have specific needs for psychotherapy." *Id.* at 615.